**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JOHN A. PATTERSON, et al., | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | Civil Action No. SA-17-CV-467-XR |
| | § | |
| DEFENSE POW/MIA ACCOUNTING | § | |
| AGENCY, et al., | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

## ORDER

On this date, the Court considered Defendants' Motion to Exclude Expert Opinions (docket no. 55), Defendants' Motion for Summary Judgment (docket no. 61), Plaintiffs' Motion for Partial Summary Judgment (docket no. 65), and the corresponding responses and replies. After careful consideration, the Court GRANTS Defendants' Motion for Summary Judgment, DENIES Plaintiffs' Motion for Partial Summary Judgment, and DISMISSES AS MOOT Defendants' Motion to Exclude.

## INTRODUCTION

In December 1941, Japan invaded the Philippines, then held by American forces.[1] In the ensuing conflict, Lieutenant Alexander N. Nininger and Colonel Loren P. Stewart were killed in action. Brigadier General Guy O. Fort was captured and then executed. Private Robert R. Morgan, Technician Fourth Class Lloyd Bruntmyer, Private First Class David Hansen, and Private Arthur H. Kelder perished in a Prisoner of War camp. These servicemembers were buried

---

[1] Unless otherwise cited, this recitation of facts is compiled from the parties' statements of facts attached as appendices to their summary judgment briefing. *See* docket nos. 61-1, 64-1, 65-1, 68-1. Some facts in dispute are noted here, but all disputed facts relevant to the Court's disposition of these motions are discussed in the analysis of Plaintiffs' claims.

(or, at least, are associated with remains buried) in Cabanatuan. In this lawsuit, their relatives seek return of their remains so that they might be buried pursuant to the relatives' religious and cultural beliefs. Docket no. 1.

These relatives, and designated Primary Next of Kin ("PNOK"), are Plaintiffs John A. Patterson, John Boyt, Janis Fort, Ruby Alsbury, Raymond Bruntmyer, Judy Hensley, and Douglas Kelder's (collectively "Plaintiffs"). In this action they sue Defendants POW/MIA Accounting Agency ("DPAA"), Director of the DPAA Kelly McKeague, the United States Department of Defense ("DOD"), Secretary of Defense James Mattis, the American Battle Monuments Commission ("ABMC"), and acting Secretary of the ABMC Robert Delessandro (collectively, "Defendants"). Each individually named defendant is named only in his or her official capacity. Docket no. 28.

Plaintiffs' central grievance is Defendants' refusal to return the remains of the fallen servicemembers at issue. The parties dispute the extent to which the remains are identified. Plaintiffs argue that they have a property interest in these remains and that Defendants' retention of these remains impinges on Plaintiffs' religious practices and Plaintiffs' interest in securing proper burial. For this injury, Plaintiffs bring claims under the Administrative Procedures Act ("APA"), Religious Freedom Restoration Act ("RFRA"), and the Constitution. Plaintiff's remaining claims are for violations of (1) procedural and (2) substantive due process, (3) the Fourth Amendment's prohibition on unreasonable seizure, (4) RFRA and (5) the First Amendment's Free Exercise Clause, and (6) the APA.

## I.      Background

The responsibilities relevant to this lawsuit—the recording, burying, disinterring, testing, and identifying servicemembers who died in World War II—have belonged to several federal

entities and agencies in the decades since the conflict. The attention paid and resources devoted to servicemembers buried overseas have fluctuated over time.

### a. Statutory History

As of 1946, the agency responsible for tracking graves and recovering and identifying the World War II dead was the Army Graves Registration Service ("AGRS"). In the Philippines, AGRS disinterred remains that might belong to U.S. servicemembers, reburied them at Manila No. 2 Cemetery, and later disinterred and processed them at Nichols Field Mausoleum. After AGRS proposed an identification, the Office of the Quartermaster General ("OQMG") had final identification authority. AGRS terminated on December 31, 1951.

The American Battle Monument Commission ("ABMC") was created in 1923 to create monuments overseas. When AGRS was terminated, ABMC assumed its responsibilities with respect to maintaining permanent military cemeteries overseas. ABMC thus maintains the Manila American Cemetery, which contains 3,700 unknowns. After April 2015, when DoD established a policy for disinterring unidentified remains for identification from permanent military ceremonies, ABMC retains approval authority for the time and manner of disinterment.

The Missing Service Personnel Act of 1995 ("MSPA") ensures that no missing servicemember is declared dead solely because of the passage of time. 140 Cong. Rec. S12217, S12220, 1994 WL 449837 (Aug. 19, 1994); *see* Pub. L. No. 104-106, Div. A § 569, 110 Stat. 186 (Feb. 10, 1996) (codified at 10 U.S.C. §§ 1501 *et seq*.). In 2009, Congress rewrote § 1509 to require a program accounting for the "unaccounted for" dating back to World War II. In 2014, Congress amended § 1501(a) to require that DoD designate a single organization responsible for this accounting. This led to the creation in January 2015 of Defense POW/MIA Accounting Agency ("DPAA").

DPAA accounts for unaccounted DoD personnel and provides information to family members. Before the 2009 amendment to § 1509, DoD was not obligated to account for missing personnel from World War II. Afterward, DoD created the DoD Part Conflict Personnel Accounting Program, which states this task is "of the highest national priority" and seeks at least 200 identifications per year. *See* DoD Directive 2310.07. In 2018, DPAA received 134 disinterment requests from families, identified 203 previously unaccounted-for military personnel, and hosted seven Family Member Updates, at which family members can get general and individual updates on DPAA's progress.

### b. The Disinterment Process

Specific thresholds govern whether a disinterment request is approved. For remains buried individually, like those associated with Stewart, Nininger, and Fort, the DPAA research must show it is more likely than not that DoD can identify the remains. For commingled remains, like those associated with the servicemembers who died as POWs, the DPAA research must show that at least 60 percent of the servicemembers associated with the group can be individually identified. A "Disinterment Criteria Guide" gives 27 factors to consider in assessing these identification likelihoods.

When a family submits a disinterment request, (1) DPAA reviews it and gives a recommendation[2] to (2) the Deputy Assistant Secretary of Defense for Military Community and Family Policy. This Deputy Assistant Secretary of Defense then gives a recommendation to (3) the Assistant Secretary of Defense for Manpower and Reserve Affairs ("Assistant Secretary"). The Assistant Secretary then approves or denies the request. If approved, DPAA coordinates with AMBC to conduct the disinterment.

---

[2] DPAA's policy requires that all requests be forwarded for decision. DPAA cannot deny or permanently defer a request.

During its review, DPAA historians compile a list of candidates for each unknown set of remains. DPAA forensic anthropologists and odontologists then compare scientific and medical records to the list and exclude candidates. This leaves a "short list," which DPAA uses to make its disinterment recommendation and the Service Casualty Offices use to request family DNA reference samples. DPAA only recommends disinterment when it has a reliable short list and enough DNA reference samples for the identification process.

### c. The Identification Process

After disinterment, the remains are transported to the DPAA Laboratory in Hawaii, where forensic anthropologists and odontologists examine the remains. Bone and tooth samples are sent to the Armed Forces DNA Identification Laboratory ("AFDIL") in Delaware, which tests the DNA samples and reports results to DPAA. AFDIL maintains a collection of family reference samples to compare DNA results to unidentified remains.

The laboratory's Science Director, a forensic pathologist, then weighs all information under a clear and convincing standard. The Science Director has identification authority, but a servicemember is only identified if the postmortem historical and scientific evidence agrees with the known antemortem facts of the case, all reasonable alternatives are eliminated, and there are no irreconcilable discrepancies between the antemortem facts and the postmortem evidence.

The Army Casualty and Mortuary Affairs Operation Division, and specifically the Past Conflicts Repatriations Branch ("PCRB"), is responsible for contact with servicemembers' families. The PCRB keeps contact with families, keeps personnel files for unaccounted-for servicemembers, does genealogy research to identify PNOKs, and manages mortuary services for identified servicemembers.

Only when remains are identified (or deemed unidentifiable) by the Armed Forces Medical Examiner ("AFME") can remains be interred. Burial or cremation is directed by the person authorized to direct disposition ("PADD"). A PADD cannot be named until the remains are officially identified.

### d. Servicemembers At Issue

At issue here are seven separate remains, three of which are specifically designated by the United States government and four of which are identified by the communal grave in which they were originally buried: (1) X–1130, which Plaintiff Patterson of Rhode Island alleges are the remains of his uncle, First Lieutenant Nininger; (2) X–3629, which Plaintiff Boyt of California alleges are the remains of his grandfather, Colonel Stewart; (3) X–618, which Plaintiff Fort of California alleges are the remains of her uncle, General Fort; (4) remains from Cabanatuan Grave 822, which Plaintiff Alsbury of Texas alleges are the remains of her brother, Private Morgan; (5) remains from Cabanatuan Grave 704, which Plaintiff Bruntmyer of Texas alleges are the remains of his brother, Technician Bruntmyer; (6) remains from Cabanatuan Grave 407, which Plaintiff Hensley of New Mexico alleges are the remains of her uncle, Private First Class Hansen; and (7) remains from Cabanatuan Grave 717, which Plaintiff Kelder of Wisconsin alleges are the remains of his uncle, Private Kelder. In this order, the Court will refer to these servicemembers by their last names. Where the Court intends to refer specifically to a Plaintiff PNOK who shares a last name with their relative servicemember, the Court will specify this.

### i. Servicemembers Associated with Common Graves

Prisoners of War held in Camp Cabanatuan, many of whom survived the infamous Bataan Death March, suffered from rampant disease caused by poor conditions and a lack of

food, water, and medical supplies. The practice of POWs in Cabanatuan was to bury their fellow soldiers in common graves. These graves contained those who died in the same 24-hour period. Since then, these remains have moved several times. They were disinterred in 1945 by AGRS and those not immediately identifiable were reinterred at U.S. Armed Forces Manila #2 Cemetery. Then, in fall 1947, these remains were again disinterred and moved to an AGRS Mausoleum. Those remains still unidentified were deemed unidentifiable, and in 1952 were buried at Manila American Cemetery.

In 2004, DPAA began a project to account for these unidentified servicemembers. To do so, DPAA disinters all remains associated with one common grave (to date, DPAA has disinterred 25 such graves), conducts historical research on this grave, and submits a recommendation. Defendants states this project is complicated by, among other difficulties, deterioration from repeated handling; the incomplete and sometimes inaccurate primary burial record, Captain Robert Conn's "Death Report, Cabanatuan"; and early false identifications by dog tags and personal items associated with some remains.

### 1. Kelder

Private Kelder, held captive after the American forces surrendered in the spring of 1942 until his death, was buried in Cabanatuan Common Grave 717. Grave 717 is the likely original location of fourteen individuals' remains, including Kelder's. Ten unknowns associated with this grave were disinterred from Manila American Cemetery in 2014. In 2015, after DNA testing, DPAA concluded that bones from four of the ten disinterred graves were Kelder's, and Plaintiff Kelder was provided those bones.

Testing of the other remains in Grave 717 continues. Plaintiffs take issue with the time this process has taken. Defendants attribute the delay to many factors, including AFDIL's

backlog, DNA results that indicate remains from at least 18 people are commingled with these remains, and bone samples that have yielded no useable DNA.

## 2. Morgan

Private Morgan died on January 1, 1943, after falling ill in Camp Cabanatuan. He is believed to have been buried in Grave 822, the likely original location of five servicemembers' remains. DPAA disinterred the four unknowns associated with Grave 822 in November 2018, began processing the remains, and submitted initial samples to AFDIL for testing.

## 3. Bruntmyer

Technician Bruntmyer died on November 1, 1942, after falling ill at Camp Cabanatuan. He is associated with Grave 704, the likely original location of ten servicemembers' remains. Grave 704 was disinterred in November 2018.

## 4. Hansen

Private First Class Hansen died on June 28, 1942, after filling ill at Camp Cabanatuan. He is associated with Grave 407, the likely original location of twenty-six servicemembers' remains, including nine unknowns. Defendants state that they received viable reference samples from Hansen's relatives only in December 2018, so DPAA deferred its disinterment recommendation for this grave. DPAA recommended disinterment on June 4, 2019, and on June 28 the Assistant Secretary of Defense for Manpower and Reserve Affairs issued a final decision approving disinterment. *See* docket no. 73 (Defendants' Notice of Factual Developments, filed July 17).

Defendants issue the same caveat for identification of Morgan, Bruntmyer, and Hansen. While Camp Cabanatuan's records associate these servicemembers with the above graves, these records contain some inaccuracies. Defendants argue it is possible that these servicemembers were misidentified and buried elsewhere.

### e. Individual Cases

The remaining three servicemembers at issue are not associated with common graves but individual sets of remains.

### i. Nininger

First Lieutenant Nininger, posthumously awarded the Medal of Honor, died in combat near Abucay on January 12, 1942. Plaintiffs argue the remains designated X-1130 Manilla #2 are Nininger's. Some historical evidence associates X-1130 with Nininger. For example, in February 1944, Colonel George Clark wrote to Nininger's father. He wrote that Nininger was buried "in grave No. 9 behind the South wall of the Abucay church."

In late 1945 and early 1946, X-1130 and other remains were disinterred from the Abucay village cemetery. Master Sergeant Abie Abraham, sent in 1945 to Abucay, interviewed a Filipino man who claimed to have dug graves for five Americans. X-1130 was then recorded as Nininger, although the parties dispute when or whether Abraham made this association.

The remains were taken to the Mauseoleum at Nichols Field for identification. A December 1948 AGRS memorandum recommended that X-1130 be identified as Nininger. These remains had already been associated with Nininger for several years. AGRS then repeatedly sought to identify X-1130 as Nininger, but the Office of the Quartermaster General ultimately denied the proposed identification. It did so because Nininger's stature was reported as 5 feet, 11 inches, while X-1130's stature was twice estimated by AGRS as 5 feet, 1 inch and 5 feet, 2.125 inches.[3] Further, several witnesses, including some who were at Nininger's funeral, stated Nininger was buried in or near the Abucay churchyard, not outside the wall or in the

---

[3] Plaintiffs state that these height estimates are inaccurate. Plaintiffs' purported expert opines that height estimates from the period are inaccurate generally. Defendants challenge this opinion and Eakin's other opinions in the pending *Daubert* motion. Defendants' expert, on the other hand, opines that X-1130's estimated stature and Nininger's recorded stature cannot be reconciled.

village cemetery. In September 1950, X-1130 was deemed unidentifiable and Nininger was deemed unrecoverable.

Plaintiff John Patterson requested in February 2015 that DPAA disinter X-1130 for comparison to Nininger. DPAA recommended against disinterment. The historical evidence is conflicted, Defendants note. For example, Clarke's letter is, Defendants argue, the central basis for the AGRS memo, but Clarke left Bataan before the burials and others of Clarke's identifications have been deemed inaccurate retroactively. Also, there are 51 total unidentified remains from the Abucay town area. Ultimately, DPAA concluded "there exists too much doubt as to the location of the burial and subsequent recovery area for these remains" and the "historic evidence is not strong enough to overcome the 4.5-inch discrepancy with the highest estimated stature of X-1130." On March 4, 2016, Patterson's request was denied.

### ii. Fort

Brigadier General Fort, who commanded the 81st Division of the Philippine Army, ordered the surrender of all U.S. forces in the Philippines on May 6, 1942. The Japanese forces executed Fort.

The governor of Misamis Oriental Province, Ignacio Cruz, gave AGRS a sworn statement in 1947. In that statement, Cruz reported conversations with several individuals, some of whom saw a "big American." A Filipino soldier reportedly told Cruz he saw Fort killed. Based on these conversations, Cruz had remains X-618 disinterred and provided to AGRS. In doing so, Cruz stated that he provided the "supposed remains of Gen. Guy O. Fort" to AGRS. Defendants doubt the veracity and conclusiveness of some of Cruz's sources.

The remains turned over by Cruz were disinterred in Cagayan, but Defendants note several sources report Fort was executed in Dansalan, which is 45 miles from Cagayan. Further,

Fort was in his 60s; of European ancestry; recorded at 5 feet, 8.5 inches; and was missing a tooth in the upper right of his mouth. Before reinterring the remains, AGRS assessed X-168. This assessment estimated X-168 was 23 to 28 years old, had an ancestry of "Mongoloid (Very Probably Filipino)," and was no taller than 5 feet, 6.4 inches. In three examinations by different AGRS analyst, no missing tooth was recorded on X-168.

Plaintiff Fort requested in 2017 that DPAA disinter X-168 for comparison to Fort. In August 2018, DPAA recommended against disinterment based on the above discrepancies. On November 28, 2018, Plaintiff Fort's request was denied.

### iii. Stewart

Colonel Stewart, who commanded the 51st Infantry Regiment of the 51st Infantry Division, was killed during a counterattack he helped organize on January 13, 1942. He was awarded the Silver Star for this action. Plaintiffs state Stewart's soldiers recovered and buried his remains. Defendants, on the other hand, state the only evidence is from a Filipino civilian who recalled in December 1946 that Philippine scouts told him they were burying an American colonel.

Master Sergeant Abraham apparently knew Stewart personally and searched for his grave for a week. He discovered and disinterred the remains designated X-3629 and associated them with Stewart (misspelling the name as "Stuart"). Abraham made this association based on the 1946 statement from Ruben Caragay, the Filipino civilian mentioned above, and the fact that Stewart was the only colonel missing near Abucay. Defendants believe Caragay only mentioned a colonel, and Abraham supplied Stewart's name. Defendants note Abraham did not have identification authority and sent the remains for AGRS processing. Plaintiffs contend Abraham's

misspelling Stewart's name led AGRS to request the wrong dental records, but Defendants label this unwarranted speculation. X-3629 was buried as an unknown at Manila American Cemetery.

Stewart's stature was recorded between 5 feet, 7.25 inches and 5 feet, 8.5 inches, while X-3629's estimated stature was no taller than 5 feet, 5.6 inches. Defendants note that four dental examinations recorded Stewart as missing the same two teeth, while X-3629's teeth were charted three times, and each time the analysts concluded X-3629 lost only one tooth before death.

Plaintiff Boyt requested in November 2017 that DPAA disinter X-3629 for comparison to Stewart. DPAA made a list of 21 candidates who died in the area, including Stewart and Nininger. DPAA's forensic anthropologist and orthodontist eliminated all but two candidates, for whom DPAA awaits family reference samples. Although Stewart was excluded as a candidate based on stature and dental discrepancies, disinterment of X-3629 was ultimately approved on June 21, 2019, based on the likelihood that X-3629 can be identified as one of the other candidates. *See* docket no. 73 (Defendants' Notice of Factual Developments, filed July 17).

Defendants note DPAA is taking steps that could lead to the identification of Nininger, Stewart, Fort, and other unrecovered servicemembers. *See* docket no. 61-1 at 35-36. For example, as part of a comprehensive study of remains from Abucay and the Bataan temporary cemeteries, DPAA seeks to identify burial patterns and draft short lists for recovered unknowns.

As it stands, Defendants have disinterred the common graves associated with all four servicemembers who died as POWs, have disinterred the remains requested by Plaintiff Boyt (although her relative, Colonel Stewart, was previously excluded as a candidate), and denied requests to disinter the remains requested by Plaintiffs Fort and Patterson (pertaining to General Fort and First Lieutenant Nininger, respectively). As the Court understands the record, no DPAA

disinterment request remains pending and the remains from disinterred graves at issue are undergoing testing.

## II.     Procedural History

Plaintiffs filed their complaint on May 25, 2017. Docket no. 1. In a prior order, this Court granted Defendants' Motion to Dismiss (docket no. 7) and gave Plaintiffs leave to amend their complaint. Docket no. 14. Plaintiffs filed an amended complaint on January 4, 2018. Docket no. 19. The amended complaint brought claims for substantive and procedural due process violations, a *Bivens* violation, a violation of the APA, violations of the Free Exercise Clause and Religious Freedom Restoration Act, mandamus relief for recovery of the remains at issue, mandamus relief for identification of the remains and further efforts, a declaratory judgment finding Plaintiffs have a right to possess the remains, a declaratory judgment to return the remains to Plaintiffs, and a declaratory judgment finding that Defendants have violated Plaintiffs' First, Fourth, and Fifth Amendment rights. *Id.*

Plaintiffs filed a Motion to Compel Production of Remains or, in the Alternative, for Physical Examination (docket no. 28) on April 13, 2018, and Defendants filed a Motion for Judgment on the Pleadings (docket no. 31) on April 20, 2018. In an order addressing both motions, the Court denied the Motion to Compel and granted in part the Motion for Judgment on the Pleadings. Docket no. 51. The Court dismissed Plaintiffs' *Bivens* claim and request for mandamus relief, but allowed the following claims to proceed: substantive and procedural due process violations, Fourth Amendment violations, APA violations, Free Exercise Clause and RFRA violations, and request for declaratory judgment. *Id.*

Now before the Court are Defendants' Motion to Exclude the Expert Opinions of John Eakin and Renee Richardson (docket no. 55), filed on March 16, 2019; Defendants' Motion for

Summary Judgment (docket no. 61), filed on April 20; and Plaintiffs' Motion for Partial Summary Judgment (docket no. 65), filed on May 10. The Court heard oral argument on all pending motions on July 22. The Court will first consider the motions for summary judgment, and if any of Plaintiffs' claims survive, the Court will turn to the motion to exclude Plaintiffs' experts.

## ANALYSIS

### III.    Motions for Summary Judgment

Defendants move for summary judgment on all claims (docket no. 61), while Plaintiffs seek partial summary judgment (docket no. 65). Specifically, Plaintiffs seek resolution of questions relevant to their due process claims (namely, whether Defendants owe families additional procedural protection and whether PNOKs have a protected right to possess the remains of a relative for purposes of burial) and their APA claims (namely, whether Defendants should have promulgated certain rules and regulations and whether Defendants improperly made formal adjudications without a formal hearing). These overlapping motions are best analyzed together.

### A.  Legal Standard

A party is entitled to summary judgment only if it demonstrates that there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In order to demonstrate that there is no genuine issue of material fact, a movant either has to negate the existence of a material element of the non-movant's claim or defense or point out that the evidence in the record is insufficient when the non-movant bears the burden of proof for that element at trial. *Lavespere v. Niagra Machine & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). To satisfy its initial responsibility, a movant without the burden of proof at trial need

only point out that there is an absence of evidence to support the non-movant's claim to shift the burden to the non-movant to show that summary judgment is not proper. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

There is a genuine issue of material fact when the evidence allows a reasonable jury to return a verdict for the non-movant. *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In order to conclude that no genuine issue of material fact exists, the court must be satisfied that no reasonable trier of fact could have found for the non-movant. *See Anderson*, 477 U.S. at 250 n.4. A court on summary judgment must review the summary judgment record taken as a whole, but the court is not permitted to make "credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). The court must review "all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010).

## B. Due Process Claims

The Court first addresses Plaintiffs' procedural and substantive due process claims. First, and principally, Defendants argue that Plaintiffs state no cognizable property or liberty interest, which several of Plaintiffs' claims require. Without such an interest, Plaintiffs' claims rooted in the Due Process Clause and Fourth Amendment fail. Thus, the Court first decides this question: Do the Plaintiffs state a constitutionally cognizable property or liberty interest in the return of their relatives' remains?

For their part, Plaintiffs argue genuine fact issues—particularly in the identification of the remains—bar any resolution of their interest at this stage. Construed in their favor, they contend the summary judgment record states a cognizable interest in possessing their relatives' remains

for purposes of burial. Even if this is true, Defendants argue their procedural due process claim fails because Plaintiffs are owed no additional procedural safeguards and their substantive due process claim fails because Plaintiffs cannot identify sufficiently egregious conduct.

The Due Process Clause embodies two distinct concepts: procedural due process and substantive due process. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Procedural due process requires the government to follow appropriate procedures before it deprives a person of an interest in life, liberty, or property; substantive due process ensures that, regardless of the fairness of the procedures used, the government does not use its power for oppressive purposes. *Daniels v. Williams*, 474 U.S. 327, 331 (1986). In other words, "[p]rocedural due process guarantees that a state proceeding which results in a deprivation of property is fair, while substantive due process ensures that such state action is not arbitrary and capricious." *Licari v. Ferruzzi*, 22 F.3d 344, 347 (1st Cir. 1994) (citing *Amsden v. Moran*, 904 F.2d 748, 753–54 (1st Cir. 1990), *cert. denied*, 498 U.S. 1041 (1991)).

When due process is invoked in a novel context, the court first determines the exact nature of the private interest that is threatened. *Lehr v. Robertson*, 463 U.S. 248, 256 (1983). To prevail on a substantive due process claim, a plaintiff must establish that he or she holds a constitutionally protected property right to which due process protections apply. *Simi Inv. Co. v. Harris Cty., Tex.*, 236 F.3d 240, 249 (5th Cir. 2000). "Property interests . . . are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972).

### i. Property Interest in Remains

Plaintiffs' case turns largely on whether they have a protected property interest in their deceased relatives' remains. The Court must start with Plaintiffs' framing of this right. That interest, Plaintiffs claim, is "a property and liberty interest in the remains of their relatives for purposes of providing a final burial, and those interests are entitled to protection under the Due Process Clause." Docket no. 64 at 11. As stated in their partial summary judgment motion, Plaintiffs seek a declaration that they have "a constitutional, statutory, and/or common law right to possess the remains of their family members for purposes of burial." Docket no. 65 at 22.

In its prior order on the Motion for Judgment on the Pleadings, the Court allowed Plaintiffs' due process claims to proceed. It did so in part because Plaintiffs alleged that "the remains have been identified and located." The Court, accepting that allegation as true and presented with Plaintiffs' list of cases recognizing some sort of property interest in relatives' remains, denied judgment on the pleadings for the due process claims. With the benefit of the summary judgment record, however, the Court sees the remains were not identified and located then and are not now.

The Court's sympathy for Plaintiffs' position notwithstanding, Plaintiffs' framing of their alleged property interest and the marshalling of legal authority in support of that interest have not evolved over the course of litigation. Instead, Plaintiffs have been content to repeat or incorporate by reference their same arguments raised against Defendants' Motion for Judgment on the Pleadings. But at that stage, the Court stated the following:

> Plaintiffs allege that the remains have been identified based on circumstantial, contemporary evidence from wartime records. Although quasi-property rights recognized by some states may be limited with respect to burial of remains and a family member's interest may diminish after burial, the Court finds that, at this stage, Plaintiffs at least sufficiently allege a quasi-property interest in the right to burial for their family members' remains.

Docket no. 51; *Patterson*, 343 F. Supp. 3d 637, 647 (W.D. Tex. 2018).

Since then, the record has clarified that the remains are not identified. Defendants thus argue that Plaintiff's purported property interest is in unidentified remains. Of course, Plaintiffs argue that identification is a fact issue that precludes summary judgment. That is, if the factfinder determines at trial that the remains *are* identified, then Plaintiffs' property interest is in identified remains, not unidentified remains. But Defendants argue the material facts are not in dispute: "Everyone is looking at the same historical records. And those records cannot be tested at trial any better than at summary judgment. No witness from the 1940s can be put on the stand. Instead, the dispute between the parties concern whether the other party is making appropriate use of this undisputed evidence." Docket no. 68 at 11. Defendants argue the weighing of these facts—which to discount, which to emphasize—is disputed, but the facts themselves are not. At summary judgment or at trial, the dental records, measurements of bone lengths, maps of Abucay, records of deaths in Camp Cabanatuan, findings of Master Sergeant Abraham, and myriad other indicia will be the same. This argument is persuasive. The Court must review the facts in the light most favorable to Plaintiffs "only when both parties have submitted evidence of contradictory facts," *Shumpert v. City of Tupelo*, 905 F.3d 310, 323 (5th Cir. 2018), and most facts relevant to identification are not disputed.

Still, even viewed in Plaintiffs' favor, no rational factfinder could identify any given set of remains as belonging to a relative of a Plaintiff. Simply put, the discovery process has not borne out Plaintiffs' allegations that wartime records identify the remains. Defendants now appear close to identifying some of the servicemembers at issue. When this litigation began in May 2017, the remains that Plaintiffs associate with Morgan, Bruntmyer, Hansen, and Stewart were buried where they had been for decades. Now, these remains, although not identified, have

been disinterred or approved for disinterment. Still, the Court cannot, on this record, accept Plaintiffs' assertion that any—much less all—of the remains are identified. A rational factfinder could, for example, weigh the historical and scientific evidence and find it likely that the remains of Plaintiffs' relatives are among a common grave's commingled remains. That is not an identification. This immediately distinguishes the cases the parties have argued at length. In none of those cases could doubt be cast on the remains' identity.

Plaintiffs' proposed property interest, which is already stated at the highest level of generality, must thus be recast as an interest in unidentified remains.[4] No case cited by the parties or revealed in the Court's research recognizes a cognizable property interest in remains the identity of which is in doubt. Putting that problem aside, and assuming for argument that the remains *were* identified, Plaintiffs still do not state a cognizable property interest. This is because a property interest, for due process purposes, cannot be stated at so high a level of abstraction.

As a preliminary matter, the parties do not agree which jurisdiction's substantive law should apply (*i.e.*, in which source of law, state or otherwise, must Plaintiffs locate their property interest). First, Plaintiffs argue "there is a deeply rooted common law principle, applicable in all jurisdictions, establishing the next of kin's entitlement to possess, control, and bury the remains of their loved ones." Docket no. 64 at 13 (citing *Newman v. Sathyavaglswaran*, 287 F.3d 786 (9th Cir. 2002)). *Newman* does include broad language. *See, e.g.,* 287 F.3d at 798 ("The property rights that California affords to next of kin to the body of their deceased relatives serve the

---

[4] Even if presented with authority that establishes such a right, though, the Court would need to reconcile its recognition of this right with the rights of families not party to this litigation. That is, if Plaintiffs claim a property interest in the commingled remains of a common grave, for example, they cannot establish which specific bones belong to their relatives, even if they could establish that their relatives' bones were among those disinterred (and they cannot establish this). Since they cannot parse the bones, they would be claiming a property interest in *all* the bones. Since all the bones are surely not those of their relatives, it follows that other families could claim the exact same property interest in the exact same bones. Plaintiffs thus ask the Court to subordinate these families' rights. Despite Defendants' repeated references to this practical problem, Plaintiffs have not grappled with the issue.

premium value our society has historically placed on protecting the dignity of the human body in its final disposition."). But the *Newman* holding has been described as a "narrow" one:

> In the anatomical gift context, the Ninth Circuit held that California parents have a due process property interest in the corneal tissue of their deceased children in [*Newman*, 287 F.3d 786]. . . . However, the court in *Newman* was careful to note it was not broadly recognizing a property right in all remains, reasoning, for example, that its holding in no way undermines the 'California law governing the state's duty to conduct autopsies to determine the cause of death which may be performed contrary to the wishes of the individual or next of kin.' *Id*. at 798 n. 15. The narrow scope of the holding in *Newman* was recognized by the only district court to consider *Newman*: In *Picon v. County of San Mateo*, a district court concluded the Ninth Circuit's holding in *Newman* 'cannot be extended to body parts other than corneas,' because the basis of the *Newman* decision was the statute specifically pertaining to corneal tissue. 2008 WL 2705576, at *3 (N.D. Cal. July 10, 2008).

*Shelley v. Cty. of San Joaquin*, 996 F. Supp. 2d 921, 926-27 (E.D. Cal. 2014).

Thus, *Newman* does not recognize a universally applicable property right in remains. As Defendants note, "Plaintiffs cannot rest on characterizations of the common law backdrop in cases like *Newman* because . . . what matters are the particular legal standards of the relevant jurisdiction." Docket no. 68 at 41. To that end, Plaintiffs argue that the relevant jurisdictions are the states in which Plaintiffs reside: California, Texas, New Mexico, Rhode Island, and Wisconsin. Docket no. 19 at 17. Defendants argue that, under a "most significant relationship" test, federal law must be the source of the property interest, as the remains are buried in a military cemetery under federal purview. Docket no. 61 at 32. If Defendants are correct, Plaintiffs' claim clearly fails. There is no federal common law on this point and the relevant statutes and regulations indicate that the Government retains discretion in disinterment decisions and that a relative can only direct disposition of remains after the servicemember is identified. *Id.* at 32-33.

The Court assumes for argument that Plaintiffs' view is correct and Plaintiffs' residences provide the correct jurisdictions. It is undisputed that courts—including those in each of Plaintiffs' jurisdictions[5]—have grappled with whether to recognize a property interest in relatives' remains for burial direction. Some courts have considered such an interest cognizable under the Due Process Clause. *See Arnaud v. Odom*, 870 F.2d 304, 308 (5th Cir. 1989) (applying Louisiana law to determine the quasi-property interest). But in those cases, the interest was inspected under state law and its contours were determined. For example, in *Arnaud*, the court examined Louisiana law and determined it created a cognizable property interest in the relief the plaintiff sought. Here, by contrast, Defendants correctly characterize Plaintiffs' request as "insist[ing] that all legal sources—common law, various states' laws, and federal common law— reach the same result at the highest level of abstraction." Docket no. 68 at 39.

Plaintiffs are asking the Court to recognize a novel interest. Given the novel interest at issue, it was incumbent on Plaintiffs to establish that the laws of each pertinent jurisdiction establish a property interest of the type they claim and that this interest is constitutionally cognizable. Plaintiffs have not done so. No case cited here or revealed in the Court's research concerns unidentified remains, nor does any case concern remains buried for decades. If there is a right, it appears to diminish over time. And if there is a right to identified remains, it does not

---

[5] *See, e.g., Shelley v. Cty. of San Joaquin*, 996 F. Supp. 2d 921, 927 (E.D. Cal. 2014) (recognizing quasi-property right in remains for limited purpose of determining burial, but specifically holding that relatives have no general property interests subject to due process protections in the remains of their deceased family members); *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 383 (Tex. 2012) (acknowledging a longstanding recognition by Texas courts of a quasi-property interest in remains to direct burial); *Matter of Johnson*, 612 P.2d 1302, 1305 (N.M. 1980) (recognizing that a quasi-property right in the remains of a deceased relative may require that some due process protections be afforded to the relative in whom the interest vests); *Sullivan v. Catholic Cemeteries, Inc.*, 317 A.2d 430, 432 (R.I. 1974) (acknowledging that remains are not property in the true sense of the term, but quasi-property "to which are attached certain rights," like burial, which nonetheless diminish once the body is laid to rest); *Koerber v. Patek*, 102 N.W. 40, 43 (Wis. 1905) (finding that, while a corpse is not property in the ordinary sense, a relative of the deceased does have a right to possession for burial).

follow that there is a right to unidentified remains. Plaintiffs ask the Court to decide that the laws of five states grant a property interest in unidentified remains buried decades prior as unknowns in military cemeteries when none of these states have done so explicitly, and they ask the Court to make this decision without parsing the laws of these states individually.

Thus, there is no cognizable property interest for several reasons. Most fundamentally, no relevant jurisdiction recognizes a property interest in unidentified remains and the remains at issue are not identified. Even if they were identified, and even if Plaintiffs' jurisdictions of residence provide the proper law under which to analyze the property interest, Plaintiffs have not adequately shown that each jurisdiction recognizes an interest like the one they ask the Court to recognize. And even if there were a property interest recognized by each—or any—relevant state, Plaintiffs have not adequately described the contours of that interest or shown that the interest is cognizable under the Due Process Clause.

## ii. Liberty Interest in Remains

Alternatively, Plaintiffs argue they have a liberty interest in the remains because the "liberty to bury our relatives and loved ones is deeply rooted in our history." Docket no. 64 at 21. Defendants argue Plaintiffs "are not asserting the ordinary right of the next of kin to dispose of their relative's remains pursuant to state law or federal regulation," however, but are instead "asserting a liberty interest in access to remains of unidentified soldiers who died overseas and were buried by the government as unknowns almost 70 years ago." Docket no. 68 at 35. As Defendants note, no court has accepted Plaintiffs' "vague statements of societal recognition of family rights and duties regarding burial of a recently deceased relative." *Id.*

Courts have insisted that an "asserted liberty interest be rooted in history and tradition," *Michael H. v. Gerald D.*, 491 U.S. 110, 123 (1989), which Plaintiffs cannot show for their

asserted interest. It is not enough that society recognize a person's general interest in burying a relative. The Court's analysis "must begin with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 302 (1993). But Plaintiffs' asserted liberty interest runs into the same problem as their property interest: it is drawn too broadly and backed by insufficient authority. Plaintiffs cannot show an interest rooted in history, as Defendants persuasively detail how "[h]istory shows that the practice of individual burial for soldiers who died in foreign conflicts, let alone a government responsibility to recover and return remains to families, are recent developments." Docket no. 68 at 35-38.

Thus, without either a cognizable liberty or property interest, Plaintiffs' procedural and substantive due process claims fail. Accordingly, the Court grants summary judgment for Defendants on Plaintiffs' due process claims.

### C. Fourth Amendment Claim

Plaintiffs also bring a claim under the Fourth Amendment for unreasonable seizure. For the reasons stated above, however, Plaintiffs state no cognizable property interest, and thus Defendants cannot have meaningfully interfered with Plaintiffs' property rights. Defendants' summary judgment motion is granted on this claim.

### D. Free Exercise Clause and Religious Freedom Restoration Act Claims

Next, the Court turns to Plaintiffs' claims related to their religious interest under the Free Exercise Clause of the First Amendment and RFRA. To invoke First Amendment protections, a plaintiff must plead he has a "sincerely held religious belief." *Frazee v. Illinois Dep't of Employment Sec.*, 489 U.S. 829, 834 (1989). "After demonstrating that he possesses a 'sincerely held religious belief,' a plaintiff must prove that a government regulation substantially burdens

that belief." *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863, 876 (S.D. Tex. 2009), *aff'd*, 611 F.3d 248 (5th Cir. 2010).

Under RFRA, "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). RFRA was enacted "to provide greater protection for religious exercise than is available under the First Amendment." *Holt v. Hobbs*, 135 S. Ct. 853, 859-60 (2015).

A plaintiff raising a RFRA claim bears the initial burden of establishing "the existence of a substantial interference with the right of free exercise." *Diaz v. Collins*, 114 F.3d 69, 72 (5th Cir. 1997). "The sincerity of a claimant's belief in a particular religious exercise is an essential and threshold element of this burden." *Louisiana College v. Sebelius*, 38 F. Supp. 3d 766, 777 (W.D. Tex. 2014) (citing *Tagore v. United States*, 735 F.3d 324, 328 (5th Cir. 2013)). "[W]hile the 'truth' of a belief is not open to question, there remains the significant question of whether it is 'truly held.'" *United States v. Seeger*, 380 U.S. 163, 185 (1965). The belief need not be central to the religion, but the adherent must "have an honest belief that the practice is important to his free exercise of religion." *Moussazadeh v. Texas Dep't of Criminal Justice*, 703 F.3d 781, 790-91 (5th Cir. 2012) (quoting *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 332 (5th Cir. 2009)). The sincerity of a religious belief is not often challenged, so it is generally presumed or easily established. *Id.*

Plaintiffs bring claims under RFRA and the Free Exercise Clause. At summary judgment, however, Plaintiffs have essentially rested on their pleadings. The Court allowed these claims to proceed because Plaintiffs "allege[d] that their free exercise of their sincerely held religious

tradition of burial has been burdened because the government refuses to return the remains of their relatives." Docket no. 19 at 32. Now, Plaintiffs incorporate by reference their briefing from the Motion for Judgment on the Pleadings and add little else. They state "the facts alleged in the Amended Complaint show that the Government has placed a substantial burden on the Families' exercise of religion." Docket no. 64 at 29. However, before the burden shifts to Defendants to show a compelling government interest that was furthered using the least restrictive means, Plaintiffs must produce summary judgment evidence meeting their burden to show a substantial burden of their sincerely held beliefs.

Yet all Plaintiffs add to the complaint's minimally detailed allegations is another reference to their assertion that the remains at issue are identified, and as discussed above the remains are not identified. The record reveals nothing further about Plaintiffs' religious beliefs or how Defendants have burdened them. Plaintiffs do not indicate the nature, substance, or contours of their beliefs, or even whether all Plaintiffs share the same religious beliefs. In the complaint, Plaintiffs allege that a "proper burial is essential for many practicing Christians," but they produce no declarations or other evidence outlining these beliefs. Defendants thus contest whether Plaintiffs' beliefs are sincerely held.

The Court is inclined to grant summary judgment on the sincerity grounds urged by Defendants, given Plaintiffs' total lack of evidence.[6] Courts have cautioned, however, that "[t]hough the sincerity inquiry is important, it must be handled with a light touch, or 'judicial shyness,'" *Moussazadeh*, 703 F.3d at 791 (quoting *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 262 (5th Cir. 2010)), and "claims of sincere religious belief in a particular practice have been accepted on little more than the plaintiff's credible assertions," *Tagore*, 735 F.3d at 328.

---

[6] Plaintiffs must support their claims with evidence, at summary judgment. *See* FED. R. CIV. P. 56(e)(2).

In keeping with this tradition of "judicial shyness," then, the Court assumes Plaintiffs show sincerely held beliefs and concludes alternatively that Plaintiffs do not show a substantial interference with these beliefs. As Defendants note, Plaintiffs allege only that their beliefs require a "proper burial," but without any explanation of what makes a "proper burial in accordance with each respective family's religious beliefs," the Court cannot assess the alleged interference. Docket no. 68 at 60 (citing docket no. 19 at 32). Thus, Plaintiffs do not meet their initial burden for either their RFRA or Free Exercise claims.

The Court will address one final alternative reason these claims fail. A "substantial burden" is one that "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). "[T]he effect of a government action or regulation is significant when it either (1) influences the adherent to act in a way that violates his religious beliefs, or (2) forces the adherent to choose between, on the one hand, enjoying some generally available, non-trivial benefit, and, on the other hand, following his religious beliefs." *Id.* But "a government action or regulation does not rise to the level of a substantial burden on religious exercise if it merely prevents the adherent from . . . enjoying some benefit that is not otherwise generally available[.]" *Id.* Defendant correctly argues that "Plaintiffs are essentially claiming that the Government owes them affirmative actions—such as disinterring unknown buried remains and making efforts to identify them—in order to comply with RFRA and the Free Exercise Clause." Docket no. 68 at 61. To give Plaintiffs what they seek, Defendants must recover, disinter, and identify the remains at issue. These affirmative acts are not available relief under RFRA or the Free Exercise Clause.

Thus, Defendants are granted summary judgment on Plaintiffs' RFRA and Free Exercise Claims.

### E. Violation of the Administrative Procedures Act ("APA")

Finally, the Court turns to Plaintiffs' alleged APA violations, which have swelled over the course of the lawsuit. In a prior order, the Court held that the statutory scheme did not preclude judicial review. Here, disposition of Plaintiffs' APA claims does not require that the Court revisit this earlier holding. Even assuming review is available under the statute, Plaintiffs' various APA claims fail.

Plaintiffs argue Defendants have violated the APA in the following ways:

- Failing to promulgate regulations by notice and comment in the Federal Register;

- Failing to use the APA's formal adjudication process to decide disinterment requests;

- Violating their own regulations, namely DPAA Administrative Instruction 2310.01, DoD Directive 2310.07, DoD Directive 1300.02, Army Regulation 638-2, and Army Field Manual 4-20-65;

- Arbitrarily and capriciously setting disinterment thresholds and denying the requests to disinter X-1130 and X-1168;

- Failing to take actions required by law, namely recommending disinterment of Common Grave 407, processing and returning remains from the other common graves at issue, processing the request to disinter X-3629, and communicating with Plaintiffs.

The Court takes each in turn.[7]

### a. Alleged failure to promulgate regulations and conduct adjudications

First, Defendants' regulations are excepted from the APA's notice and comment rulemaking requirements, which do not apply "to the extent that there is involved—(1) a military or foreign affairs function of the United States." 5 U.S.C. § 552(a)(1). Regulation of, for

---

[7] Plaintiffs also argue the Court cannot grant Defendants' motion without a certified administrative record. Docket no. 64 at 41. This is incorrect, as the APA states "the court shall review the whole record or those parts of it cited by a party." 5. U.S.C. § 706.

example, the disinterment, processing, and identification of servicemembers from past conflicts is plainly a military function.

Second, the APA's formal adjudication requirements only apply "when the governing statute specifies that an agency must conduct a 'hearing on the record,' as opposed to a statutory requirement of a 'hearing' or a 'full hearing.'" *Arwady Hand Truck Sales, Inc. v. Vander Werf*, 507 F. Supp. 2d 754, 759 (S.D. Tex. 2007). Plaintiffs point to no such language in a relevant statute, and the Court is aware of none. Thus, only the procedures required for informal adjudications apply. While formal adjudications require the "trial-type procedures" of 5 U.S.C. §§ 554, 556-557, "informal adjudications" require only the minimal requirements of 5 U.S.C. § 555. *See Pension Ben. Guar. Corp. v. LTV Corp*., 496 U.S. 633, 655 (1990). DPAA must provide, under § 555, "[p]rompt notice" of denial "of a written application, petition, or other request of an interested person made in connection with any agency proceeding," and that notice "shall be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e). Plaintiffs do not allege violation of these informal adjudication requirements, and in any event they appear clearly met. Plaintiffs were allowed to participate in the process by submitting disinterment request, and Plaintiffs were provided denial notices (that included the grounds for denial) for all disinterment requests at issue that DPAA denied.

### b. Alleged failure to follow own regulations

Next, Plaintiffs argue Defendants arbitrarily and capriciously denied the request to disinter X-1130 for comparison to First Lieutenant Nininger and the request to disinter X-618 for comparison to Brigadier General Fort. Defendants argue the "decisions not to disinter certain unknown remains at this time, deferral of recommendations regarding disinterment until relevant

information is received, and methodical processing of disinterred remains for identification" are committed to agency discretion and unreviewable. Docket no. 68 at 14.

APA judicial review is not available if "agency action is committed to agency discretion by law," 5 U.S.C. 5 U.S.C. § 701(a), the test for which is whether a "court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). Plaintiffs do not dispute that the *statutes* give no meaningful standard for Defendants' task of accounting for servicemembers of past conflicts, but they argue that the Court can review whether Defendants violated their own *regulations*.

An agency's own regulations can provide the "law to apply." *Ellison v. Connor*, 153 F.3d 247, 251 (5th Cir. 1998). But Defendants argue the cited regulations—DPAA Administrative Instruction 2310.01, DoD Directive 2310.07, DoD Directive 1300.02, Army Regulation 638-2, and Army Field Manual 4-20-65—provide no meaningful standard for the Court to measure against Defendants' actions.

The Court doubts that any of these regulations provide meaningful law to apply, nor can Plaintiffs show violation of any particular regulation. The closest Administrative Instruction 2310.01 comes to providing meaningful standards are its statements that: the "goal for the time from receipt [of a disinterment request] to submission of the DPAA Director's recommendation" is 150 days; family member requests "will be given high priority" compared to third-party or internal disinterment proposals; and requests from families and third parties cannot be permanently deferred. Docket no. 31-1 at 165. Even if these statements gave law to apply, the most that can be shown, here, is that DPAA has exceeded its "goal" for some remains. DPAA has not permanently deferred any request.

Next, Plaintiffs point to the statement in DoD Directive 2310.07 that "[i]nformation pertaining to the . . . efforts to locate, recover, and, when applicable, identify remains of unaccounted-for DoD personnel . . . from past conflicts . . . will be provided to the primary next of kin (PNOK)[.]" Docket no. 63-1 at 41. The PCRB has communicated information to Plaintiffs. The record shows conversations at family updates, documents forwarded to Plaintiffs, responses to Plaintiffs' letters, and phone calls. Plaintiffs think the provided information inadequate, but this directive does not give a standard against which to measure the adequacy of Defendants' efforts.

Third, Plaintiffs refer to three provisions in DoD Directive 1300.22: § 3(a), which states that remains "will be recovered, identified, and returned to their families as expeditiously as possible while maintaining the dignity, respect, and care of the deceased to the extent possible and protecting the safety of the living"; § 3(c), which states that "the movement of the deceased's remains will be handled with the reverence, care, priority, and dignity befitting them and their circumstances"; and § 3(d), which states that the remains "will be continuously escorted . . . from the preparing mortuary to the funeral home." Docket no. 63-1 at 65-66. None of these statements provide meaningful standards.

Fourth, Plaintiffs refer to the statement in Directive-type Memorandum-16-003 that "DoD must have the scientific and technological ability and capacity to process the unknown remains for identification with 24 months after the date of disinterment." Docket no. 63-2 at 5. Plaintiffs argue Kelder's identification has taken longer than 24 months. But this memorandum took effect in July 2018, well after Kelder's disinterment, and Kelder was identified within five months of disinterment. There are likely still outstanding bones of Kelder's in the commingled remains being tested, but this memorandum does not state that every element of commingled

remains must be identified and returned within 24 months. Finally, Plaintiffs cite Army Regulation 4-20-65, which was cancelled in 2014, and Army Regulation 638-2, which applies only to the Army. The Army is not responsible for disinterring or making disinterment recommendations with respect to the remains at issue; DPAA is not part of the Army. Docket no. 61 at 19.

Still, even if there were law to apply, the challenged final actions easily clear the arbitrary and capricious standard. When reviewing "agency decisions under the arbitrary and capricious standard, we cannot substitute our judgment or preferences for that of the agency. To affirm an agency's action, we need only find a rational explanation for how the [agency] reached its decision." *Associated Builders & Contractors of Texas, Inc. v. Nat'l Labor Relations Bd.*, 826 F.3d 215, 224-25 (5th Cir. 2016) (citation omitted). "[T]here is a presumption that the agency's decision is valid, and the plaintiff has the burden to overcome that presumption by showing that the decision was erroneous." *Tex. Clinical Labs, Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010).

Plaintiffs cannot meet this burden for any of its challenged decisions. As best the Court can tell, the challenged decisions are the use of disinterment thresholds and the denials of the requests to disinter X-1130 and X-168.[8] First, no rational factfinder, under this standard, could find Defendants were irrational in denying the request to disinter X-1130. Plaintiffs quibble with certain of Defendants' factual statements and with Defendants' reliance on purportedly unreliable testimony. Docket no. 64 at 63. But the record is clear that Nininger's case has received extensive attention, and the decision not to disinter X-1130—because of doubt over the location of Nininger's burial, the height discrepancy between Nininger and X-1130, and

---

[8] Plaintiffs also reference the decisions to disinter Common Graves 704 and 822. But Plaintiffs agree that these disinterment decisions are "reasonable" and appear not to challenge these decisions. Docket no. 64 at 42.

concerns with the historic evidence—is rational. Defendants have detailed why they consider it unlikely that X-1130 is Nininger's remains and Defendants have considered—and discounted—all discrepancies and concerns Plaintiffs raise.

Second, for similar reasons, Defendants' denial of the request to disinter X-618 was rational. Defendants offer several reasons for the decision: the evidence that Fort was executed 65 miles away from where X-618 was buried and the discrepancies in height, age, ancestry, and dental records between Fort and X-618. Again, Defendants have considered all facts Plaintiffs raise.

Third, Plaintiffs challenge the thresholds requiring, for example, identification of 60 percent of persons associated with a common grave before disinterment. They argue these are arbitrary standards. But as Defendants note, DoD need only show its "reasons and policy choices satisfy minimum standards of rationality," *10 Ring Precision, Inc. v. Jones*, 722 F.3d 711, 723 (5th Cir. 2013), and it is "plainly reasonable for DoD to disinter respectfully buried remains of unknown only with a sufficient level of certainty that it will be able to identify those remains shortly after disinterment," docket no. 68 at 21.

Thus, even assuming Defendants' actions warrant review, Plaintiffs cannot show any decision was arbitrary and capricious.

### c. Alleged failure to take actions required by law

Finally, Plaintiffs contend several failures to act—or delays in acting—on Defendants' part violate the APA. Plaintiffs seek relief under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." "[I]n certain circumstances, agency inaction may be sufficiently final to make judicial review appropriate," but this inaction must "mark the consummation of the agency's decisionmaking process." *Patterson*, 343 F. Supp. 3d at 651. But

§ 706(1) claims "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).

Here, Plaintiffs point to the following failures or delays: recommending disinterment of Common Grave 407; processing remains from Common Graves 704, 717, and 822; processing request to disinter X-3629; and communicating with Plaintiffs. None of these are discrete actions required by law. Further, the record shows that Defendants continue to progress in processing all disinterred remains, and Defendants recommended disinterment of Common Grave 407 on June 28. As for communication with families, Plaintiffs can point to no discrete, required action Defendants have not taken.

Accordingly, Defendants are granted summary judgment on Plaintiffs' APA claims. Thus, without any substantive claim remaining, Plaintiffs' claim for declaratory relief also fails.

## CONCLUSION

Accordingly, the Court GRANTS Defendants' Motion for Summary Judgment (docket no. 61) and DENIES Plaintiffs' Motion for Partial Summary Judgment (docket no. 65).

Defendants' Motion to Exclude Expert Testimony (docket no. 55) is DISMISSED AS MOOT.

The Clerk is DIRECTED to enter judgment in favor of Defendants and against Plaintiffs. Plaintiffs shall take nothing by their claims.

SIGNED this 29th day of July, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE